FILED

2006 OCT 11   AM 11: 20

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN D. BROOKS, <br><br>                 Plaintiff, <br><br> vs. <br><br> EDWARD ALAMEIDA, JR. Et al., <br><br>                 Defendant. | CASE NO. 04CV2059-H (CAB) <br><br> **ORDER DENYING PLAINTIFF'S MOTIONS FOR RECONSIDERATION AND LEAVE TO FILE A THIRD AMENDED COMPLAINT** |

On October 12, 2004, Plaintiff Steven D. Brooks, a state prisoner proceeding *pro se* and *in forma pauperis*, brought this case pursuant to 42 U.S.C. § 1983. (Doc. No. 1.) On January 6, 2006, he filed a second amended complaint. (Doc. No. 43.) On the same day, Plaintiff filed a motion for partial summary judgment. (Doc. No. 38.) Defendants filed a motion to dismiss the second amended complaint and to strike Plaintiff's prayer for punitive damages and attorney's fees under Fed. R. Civ. P. 12(f) on March 13, 2006. (Doc. No. 49.) On April 4, 2006, Plaintiff filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b)(3). (Doc. No. 56.) The Court granted Defendants' motion to dismiss with prejudice and denied Plaintiff's motion for Rule 60(b)(3) relief on August 11, 2006. (Doc. No. 75.) Plaintiff filed a motion for reconsideration and for leave to file a third amended complaint on September 28, 2006. (Doc. No. 79.) For the following reasons, the Court DENIES Plaintiff's motions.

**Discussion**

1.      **Plaintiff's Motion for Reconsideration**

Motions for reconsideration are governed by Fed. R. Civ. P. 60(b) and in this District, by Civil Local Rule 7.1(i)(1)-(2). A motion for reconsideration "is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." School Dist. No. 1J, Multnomah County v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993). Whether to grant or deny a motion for reconsideration is in the sound discretion of the district courts. Navajo Nation v. Norris, 331 F.3d 1041, 1046 (9th Cir. 2003) (citing Kona Enter., Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir. 2000).

Plaintiff's § 1983 claims relate to his 1999 petition for habeas relief, which the District Court for the Central District of California denied.[1] Plaintiff previously raised these civil rights claims in a 2002 § 1983 action in this Court, Brooks v. Giurbino, et. al., Case No 02CV2537-H (NLS) ("the 2002 action"). On April 5, 2004, the Court granted Defendants' summary judgment motion on Plaintiff's § 1983 claims in the 2002 action and denied Plaintiff's motion to amend the judgment pursuant to Fed. R. Civ. P. 59 on May 11, 2004. (Brooks v. Giurbino, et. al., Doc. No.'s 61 & 72.) Plaintiff filed a new complaint pursuant to 42 U.S.C. § 1983 on October 12, 2004 and an amended complaint on January 6, 2006. (Doc. No.'s 1 & 43.) Defendants filed a motion to dismiss on March 13, 2006. (Doc. No. 49.) The Court granted Defendants motion with prejudice on August 11, 2006. (Doc. No. 75.) The Court concluded that Plaintiff's renewed action under § 1983 was barred by res judicata and collateral estoppel.

In reaching its decision, the Court determined that the 2002 and 2006 actions involved the same claims and parties, and were fully litigated in the first action. See

---

[1] Additionally, both the District Court and the Ninth Circuit denied Plaintiff's requests for a certificate of appealability.

1   e.g. Nordhorn v. Ladish Co., Inc., 9 F.3d 1402, 1404 (9th Cir. 1993). "In order to bar

2   a later suit under the doctrine of res judicata, an adjudication must (1) involve the same

3   'claim' as the later suit, (2) have reached a final judgment on the merits, and (3)

4   involve the same parties or their privies." Nordhorn, 9 F.3d at 1404 (citing Blonder-

5   Tongue Lab. v. Univ. of Illinois Found., 402 U.S. 313, 323-24 (1971)). Plaintiff's

6   2002 and 2006 complaints were based on an alleged denial of access to the prison law

7   library facilities and alleged inadequacies of the library at Centinela State Prison

8   ("Centinela"), where he was incarcerated during the pendency of his federal habeas

9   petition in 1999. Plaintiff's habeas petition challenged his state court conviction for

10  three counts of first degree burglary, three counts of first degree robbery, two counts

11  of forcible rape, seven counts of other sexual crimes, and one count of escape while

12  charged with a felony. In both the his 2002 and 2006 actions for § 1983 relief, Plaintiff

13  maintained that the inadequacies of the Centinela law library prevented him from filing

14  sufficient papers concerning his 1999 habeas petition. Thus, the Court concluded that

15  they both concerned the same set of facts and that his claims were fully and finally

16  litigated in the 2002 action when the Court granted Defendants' motion for summary

17  judgment. Summary judgment is a final judgment on the merits for purposes of

18  preclusion. See Kourtis v. Cameron, 419 F.3d 989, 996 n. 4 (9th Cir. 2005).

19  Therefore, the Court also concluded that Plaintiff's claim was fully adjudicated on the

20  merits in the 2002 action. Finally, the Court determined that the action involved the

21  same parties or their privies. See Sandpiper Village Condo. Ass'n., Inc. v. Louisiana-

22  Pacific Corp., 428 F.3d 831, 864 (9th Cir. 2005.) Two Defendants, Warden G.J.

23  Giurbino and Librarian R. Pitones were named in both the 2002 and 2006 cases, and

24  the remainder of the Defendants in the 2006 action held essentially the same positions

25  as those in the 2002 action. Under the circumstances, the Court concluded that res

26  judicata barred the 2006 relitigation of Plaintiff's cause of action.

27          The Court also concluded that issue preclusion barred Plaintiff's library access

28  claim because the Court conclusively determined in the 2002 action that he did not

1  suffer an actual injury.  An issue may not be relitigated where the same issue was the

2  subject of an earlier proceeding and (1) the issues are identical, (2) there was a final

3  judgment in the first proceeding, and (3) the proceedings involve the same parties or

4  their privies.  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 (9th Cir.

5  2006).  The Court determined that the actual injury issue relating to Plaintiff's library

6  access claim was barred by collateral estoppel under the standards set forth in Reyn's

7  Pasta.

8         Plaintiff has not presented any additional information to warrant reconsideration

9  of the Court's previous order.  See ACandS, Inc., 5 F.3d at 1263.  In support of his

10  motion for reconsideration, Plaintiff claims that he can now prove the actual injury

11  necessary to justify § 1983 relief.  To support this proposition, Plaintiff extensively

12  discusses his allegations of ineffective assistance of counsel at trial, which were the

13  basis of his 1999 habeas petition in the Central District of California.  However,

14  Plaintiff fails to connect his ineffective assistance arguments with any actual injury

15  caused by the alleged denial of access to the prison law library at Centinela in 1999.

16  Furthermore, Plaintiff presents no evidence that new facts, law, or clear error warrant

17  reconsideration of the Court's previous order granting Defendants' motion for

18  summary judgment with prejudice.  See ACandS, Inc., 5 F.3d at 1263.  Accordingly,

19  the Court DENIES Plaintiff's motion for reconsideration.

20  **2.     Plaintiff's Motion for Leave to File a Third Amended Complaint**

21         Federal Rule of Civil Procedure 15(a) states that, after a responsive pleading has

22  been served, "a party may amend [its] pleading only by leave of the court or by written

23  consent of the adverse party . . . ."  Fed. R. Civ. P. 15(a).  District courts have

24  discretion whether to grant or deny a motion to amend a complaint.  Foman v. Davis,

25  371 U.S. 178, 182 (1962); Swanson v. United States Forest Serv., 87 F.3d 339 (9th Cir.

26  1996); Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980).  In this circuit, courts

27  typically consider four factors in deciding whether to grant a motion for leave to amend

28  a complaint: (1) bad faith or dilatory motive on the part of the movant; (2) the futility

of the proposed amendment; (3) undue delay in filing the motion; and (4) prejudice to the opposing party. <u>Roth v. Marquez</u>, 942 F.2d 617, 628 (9th Cir. 1991) (citing <u>DCD Programs v. Leighton</u>, 833 F.2d 183, 186 (9th Cir. 1987).

Because the Court has concluded that Plaintiff's library access claim is barred by res judicata and collateral estoppel, a third amended complaint based on the same claim is futile. <u>Roth</u>, 942 F.2d at 628. Accordingly, the Court DENIES Plaintiff's motion for leave to file a third amended complaint.

### Conclusion

For the reasons stated above, the Court **DENIES** Plaintiff's motion for reconsideration and **DENIES** his motion for leave to file a third amended complaint. The case shall remain closed.

IT IS SO ORDERED.

Dated: ___*10/10/06*___

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

1

2  <u>COPIES TO:</u>

3  ** Magistrate Judge Bencivengo

4  Steven D. Brooks, Pro Se
   K-16234
5  High Desert State Prison
   P.O. Box 3030
6  Susanville, CA 96127-3030

7
   G. Michael German
8  Deputy Attorney General
   110 West A Street, Suite 1100
9  P.O. Box 85266
   San Diego, CA 92186-5266
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEVEN DEXTER BROOKS
(Name)

HIGH DESERT STATE PRISON
(Address)

SUSANVILLE, CA. 96130
(City, State, Zip)

K-16234
(CDC Inmate No.)

# United States District Court
## Southern District of California

STEVEN DEXTER BROOKS ,
(Enter full name of plaintiff in this action.)

              Plaintiff,

  v.

R.B. Garcia, S. Ryan, R.A ,
Asuncion, H. Cullors, R. ,
Pitones, P. Robb, S. Aguirre, ,
L. Salgado, R. Galindo, ,
G.J. Guirbino ,
(Enter full name of each defendant in this action.)

              Defendant(s).

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. 04-2059H (CAB)
(To be supplied by Court Clerk)

"THIRD AMENDED"
Complaint Under the
Civil Rights Act
42 U.S.C. § 1983
(WITH JURY DEMAND)

## A. Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. If you wish to assert jurisdiction under different or additional authority, list them below.

    28 U.S.C § 1331 and § 1367

## B. Parties

1. **Plaintiff**: This complaint alleges that the civil rights of Plaintiff, _____STEVEN_____
(print Plaintiff's name)

DEXTER BROOKS _____, who presently resides at HIGH DESERT STATE PRISON
(mailing address or place of confinement)

P.O. Box 3030, Susanville, CA. 96130 _____, were violated by the actions

of the below named individuals. The actions were directed against Plaintiff at Centinela

State Prison _____ on (dates) 1999 , 2000 , and 2001 .
(Institution/place where violation occurred)    (Count 1)    (Count 2)    (Count 3)

2. **Defendants**: (Attach same information on additional pages if you are naming more than 4 defendants.)

1.

Defendant _Rosie B. Garcia_ resides in _UNKNOWN_
(name)                                          (County of residence)
and is employed as a _Was Warden at Centinela_. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _under color of state law as Warden of Centinela_
_Prison From January 1999 through September 2000, responsible For_
_overall management of prison._

Defendant _S. Ryan_ resides in _Unknown_
(name)                                          (County of residence)
and is employed as a _Was Associate Warden_. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _Was Warden of Complex II at Centinela From_
_January 1999 through March of 2001, responsible For developing_
_law library access procedures during lockdowns_

Defendant _R.A. Asuncion_ resides in _UNKNOWN_
(name)                                          (County of residence)
and is employed as a _CAPTAIN OF FACILITY "C"_. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _Was Facility "C" Captain at Centinela From_
_January 1999 through February 2001, responsible For developing_
_law library procedures during lockdowns_

Defendant _M. Cullors_ resides in _UNKNOWN_
(name)                                          (County of residence)
and is employed as a _Supervisor of Law Library_. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _responsible For developing Centinela's law_
_library access Program and For overall Supervision._


Defendant _R. Pitones_ resides in _UNKNOWN_
and is employed as _Senior Librarian_. This defendant is sued in
his/her ☒ individual compacity
_ACTING UNDER COLOR OF STATE LAW, responsible For direct_
_Supervision of Satellite law libraries and program_
_implementation._

2. (a)

Defendant __P. Robb__ resides in __UNKNOWN__
(name)                                              (County of residence)
and is employed as a __Library Technical Assistant__. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: __responsible For the day to day operation__
__of the Satellite law libraries.__

Defendant __S. Aguirre__ resides in __UNKNOWN__
(name)                                              (County of residence)
and is employed as a __Library Technical Assistance__. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: __responsible For the day to day operation__
__of the satellite law libraries.__

Defendant __L. Salgado__ resides in __UNKNOWN__
(name)                                              (County of residence)
and is employed as a __Library Technical Assistant__. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: __responsible For the day to day operation__
__of the Satellite law libraries__

Defendant __R. Galindo__ resides in __UNKNOWN__
(name)                                              (County of residence)
and is employed as a __WAS CAPTAIN FACILITY "C"__. This defendant is sued in
(defendant's position/title (if any))
his/her ☒ individual ☐ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: __responsible For developing law library__
__procedures during lockdowns From March 2001__
__through the year 2003.__

Defendant __G.J. GUIRBINO__ resides in __UNKNOWN__
and is employed as __WAS WARDEN OF Centinela__  This defendant is sued in
his/her ☒ individual compacity
__under color of state law, he was responsible For__
__overall management of the prison From September__
__2000 through the year 2004__

2. (b)

**C. Causes of Action** (You may attach additional pages alleging other causes of action and the facts supporting them if necessary.)

Count 1: The following civil right has been violated: RECKLESS INDIFFERENCE

(E.g., right to medical care, access to courts,

TO RIGHT TO ACCESS COURTS

due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

Supporting Facts: [Include all facts you consider important to Count 1. State what happened clearly and in your own words. You need not cite legal authority or argument. Be certain to describe exactly what each defendant, by name, did to violate the right alleged in Count 1.]

1. Plaintiff was hindered from pursuing Post-Conviction relief on a non-frivolous claim he was denied his Constitutionally Guaranteed right to the effective assistance of Counsel, where both his trial and appeal Lawyer caused him to lose a Motion to exclude the testimony of a jailhouse informant, when they erroneously argued that the critical inquiry for determining whether the informant was a "government agent", was whether the state "intentionally created a situation likely to induce the plaintiff to Make incriminating Statements" within the Meaning of United States v. Henry, 447 U.S. 264 (1980)

2. The plaintiff had No reasonably adequate opportunity to present this claim to the Courts. In January 1999, he was transferred to Centinela State Prison. The Defendants had a law library with a Fifteen inmate Seating Compacity, which must provide services to a population of Two Thousand inmates.

3. The Defendants did not allow plaintiff to receive open-line access to their law library, even when Space and time was available, if plaintiff had No DUCAT (Appointment).

4. The Defendants required plaintiff to provide proof of a court deadline within a 30 day period, to receive two hours a week access to their law library.

CONTINUED →

3. (a)

**Count 2:** The following civil right has been violated: <u>access To courts claim</u>

<u>Continued</u>
(E.g., right to medical care, access to courts, due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

**Supporting Facts:** [Include all facts you consider important to Count 2. State what happened clearly and in your own words. You need not cite legal authority or argument. Be certain to describe exactly what each defendant, *by name,* did to violate the right alleged in Count 2.]

5. The defendants suspended their law library program from the year 1999 through the year 2001, due to prison lockdowns, and not based upon the individual actions of the plaintiff.

6. The defendants fail to comply with California Code of Regulations, Title 15 Section 3120 (a) and 3122, requiring that they provide all inmates with a law library regardless of their housing or legal status.

7. The defendants failure to provide plaintiff access to a law library or alternative legal assistance between the year 1999 and 2001, caused the plaintiff to miss the 1-year statute of limitations period for filing his Ineffective Assistance of Counsel claim in Federal Court. See 28 U.S.C. § 2244 (d)(1)

8. The defendants not only suspended their law library program due to lockdowns, rather than due to plaintiff's actions, but they also arbitrarily excluded the plaintiff from accessing a law library five days a week due to prison employment.

**Count 3:** The following civil right has been violated: NONE

3. (b)

1983 SD Form

K:\COMMON\EVERYONE\1983\1983FORM.COM

(E.g., right to medical care, access to courts,

due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

   **Supporting Facts:**   [Include all facts you consider important to Count 3.  State what happened clearly and in your own words.  You need not cite legal authority or argument.  Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 3.]

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**D. Previous Lawsuits and Administrative Relief**

   1.  Have you filed other lawsuits in state or federal courts dealing with the same or similar facts

4.

involved in this case? ☒ Yes ☐ No.

If your answer is "Yes", describe each suit in the space below.  [If more than one, attach additional pages providing the same information as below.]

(a) Parties to the previous lawsuit:
Plaintiffs: STEVEN DEXTER BROOKS

Defendants: G.J. GUIRBINO, J.D. STOKES, R. PITONES, Z. STEINHOUSE

(b) Name of the court and docket number: U.S. District Court For the Southern District of California, CASE NO 02-CV-2537 H (NLS)

(c) Disposition: [ For example, was the case dismissed, appealed, or still pending?] CASE WAS dismissed with prejudice

(d) Issues raised: (1) Failure To update law library resulted in dismissal of Federal habeas Petition on March 10, 2001. See Brooks v. Garcia et. al. CASE NO 99-CV-1007 DOC (RZ) (2) law library access claim dismissed without prejudice on August 25, 2003. See 02 CV 2537 H (NLS) Southern District.

(e) Approximate date case was filed: December 23, 2002

(f) Approximate date of disposition: April 4, 2004

2. Have you previously sought and exhausted all forms of informal or formal relief from the proper administrative officials regarding the acts alleged in Part C above? [E.g., CDC Inmate/Parolee Appeal Form 602, etc.] ? ☒ Yes ☐ No.

If your answer is "Yes", briefly describe how relief was sought and the results.  If your answer is "No", briefly explain why administrative relief was not sought.

1. On July 12, 2002, Centinela State Prison denied My CDC 602 Appeal at the Second level. (Appeal Log # CEN-C-02-0616)

2. On September 23, 2004, the California Department of Corrections denied My appeal per Cal. Code Reg. Tit. 15 § 3084.6 (c) (Untimely Appeal) No Further remedies are available

**E. Request for Relief**

Plaintiff requests that this Court grant the following relief:

1. ~~An injunction preventing defendant(s):~~ *ISSUE DECLARATORY JUDGMENT:*
PRISON AUTHORITIES FAILURE TO PROVIDE ADEQUATE LAW LIBRARY HINDERED
PLAINTIFF'S ABILITY TO PURSUE POSTCONVICTION RELIEF ON A
NON FRIVOLOUS CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL .

2. Damages in the sum of $ _OPEN_ .

3. Punitive damages in the sum of $ _25,000 From Liable DEFENDANTS_

4. Other: _COURT COST, ATTORNEY FEES and any other relief_
_available, Nominal damages._ .

**F. Demand for Jury Trial**

Plaintiff demands a trial by ☒ Jury ☐ Court. **(Choose one.)**

**G.  Consent to Magistrate Judge Jurisdiction**

In order to insure the just, speedy and inexpensive determination of Section 1983 Prisoner cases filed in this district, the Court has adopted a case assignment involving direct assignment of these cases to magistrate judges to conduct all proceedings including jury or bench trial and the entry of final judgment on consent of all the parties under 28 U.S.C. § 636(c), thus waiving the right to proceed before a district judge. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to utilize this efficient and expeditious program for case resolution due to the trial judge quality of the magistrate judges and to maximize access to the court system in a district where the criminal case loads severely limits the availability of the district judges for trial of civil cases. Consent to a magistrate judge will likely result in an earlier trial date. If you request that a district judge be designated to decide dispositive motions and try your case, a magistrate judge will nevertheless hear and decide all non-dispositive motions and will hear and issue a recommendation to the district judge as to all dispositive motions.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including trial, and the entry of final judgment by indicating your consent below.

Choose only one of the following:

☒ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☐ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

_9-25-06_
_____
Date

_John D. Bird_
_____
Signature of Plaintiff

6.

EXHIBIT

# 1

*Law Offices of*
RUDOLPH E. LOEWENSTEIN
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | CASE NO. 95HF0026 |
| ) | |
| Plaintiff, ) | MEMORANDUM OF |
| ) | POINTS AND |
| vs. ) | AUTHORITIES IN |
| ) | SUPPORT OF MOTION |
| STEVEN DEXTER BROOKS, ) | TO EXCLUDE THE |
| ) | TESTIMONY OF |
| Defendant. ) | INFORMANT RICHARDS |
| ) | |
| ) | Date:  5-6-96 |
| ) | Time:  9:00 a.m. |
| ) | Dept:  45 |

## STATEMENT OF THE CASE

The Defendant, STEVEN DEXTER BROOKS, is charged in the Orange County Superior Court with seventeen felony counts and numerous assorted enhancements.  These charges stem from the alleged sexual assault and robbery of three women in Orange County.

Defendant Brooks was arraigned on January 5, 1995. On that date, Defendant's then counsel formally filed his Invocation of Right to Counsel and Right to Remain Silent.  A copy of the Invocation is labeled as Exhibit "A" and attached

751

1   hereto as though fully set forth herein.

2        A preliminary hearing was conducted in the Harbor

3   Municipal Court of Orange County on August 15, 16, 17 and 21.

4   Prior to beginning the preliminary hearing, both counsel

5   presented oral argument on the defense's Motion to Recuse the

6   Prosecuting Attorney, and evidence was presented on Defendant's

7   Motion to Exclude Informant Richards' Testimony.

8        The Honorable Frances Munoz, judge presiding, denied

9   both motions.  Based on her finding that neither the police nor

10  the deputy district attorney had solicited Richards to obtain

11  the information, the magistrate admitted the informant's

12  testimony at the preliminary hearing.  At the conclusion of the

13  preliminary hearing, Judge Munoz held Defendant to answer on

14  all charges and enhancements as charged in the First Amended

15  Felony Complaint.  A copy of the preliminary hearing transcript

16  is lodged with this court.

17       Defendant's Penal Code § 995 Motion to Set Aside the

18  Information for lack of probable cause was heard on November 9,

19  1995, in Department 41 of the Superior Court.  The  Honorable

20  John J. Ryan, judge presiding, denied the motion.

21

22                    **STATEMENT OF FACTS**

23       Ricky Richards (hereafter "Richards") is a longtime

24  police informant who worked in that capacity, prior to

25  Defendant's case, with the Anaheim and Garden Grove Police

26  Departments, the District Attorney's office, and the Bureau of

27  Alcohol, Tobacco and Firearms.  (Reporter's Transcript of the

28  Preliminary Hearing, hereafter referred to as "RT", 8/16/95,

RUDOLPH E. LOEWENSTEIN
Law of
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

                              2

1   pp.145, 162, 164).  Richards' lengthy criminal history includes

2   at least fifteen felony convictions, the greater part of his

3   adult life having been spent in prison.  (RT, 8/15/95, pp.94-

4   95; RT, 8/17/95, pp.99, 259-260).  Richards' testimony is

5   expected to be offered in the case against Defendant Brooks at

6   trial.

7        In January, 1995, Richards called Detective Larry

8   Garrison (hereafter "Garrison"), his contact with the Anaheim

9   Police Department, saying he had information on a child molest

10  suspect who was in custody at the jail.  (RT, 8/15/95, p.104;

11  RT, 8/16/95, pp.172-173).  When Garrison visited Richards at

12  the jail on January 10, 1995, Garrison told Richards he didn't

13  need the information Richards offered him on the child molest

14  suspect.  However, the detective showed Richards a photograph

15  of another suspect, expressly telling Richards that if Garrison

16  could arrange for Richards and this other inmate to be put in

17  the same cell, he wanted Richards to interrogate and inform

18  against the inmate.  (RT, 8/16/95, pp.112, 113, 117-118)

19  Shortly thereafter, Richards read a newspaper account of

20  Defendant's arrest.  (RT, 8/16/95, p.184).

21       In spite of his best efforts, Garrison was unable to

22  make the connection and Richards never met the suspect in the

23  photograph.  However, within days of the January 10th meeting,

24  Richards called Garrison asking to see someone in Defendant

25  Brooks' case, as he had obtained information against Defendant

26  and not the inmate in the photograph.  (RT, 8/15/95, p.106).

27       Capitalizing on his position as a tier tender at the

28  jail, which afforded him extraordinary access to other inmates,

1  Richards had begun eliciting incriminating statements from

2  Defendant.  To this end, Richards devised an elaborate process

3  whereby he visited Defendant frequently, stopping by his cell

4  door, engaging him in conversation, hurrying to his own cell to

5  jot down quick notes, and then returning to continue the

6  interrogation.  (RT, 8/17/95, p.81).

7          In response to Richards' call, Garrison set up a

8  meeting with Richards and Newport Beach Police Detective Jay

9  Winn (hereafter "Winn") and Deputy District Attorney Claudia

10  Silbar (hereafter "Silbar").  In the course of three tape

11  recorded interviews, Richards provided investigators and the

12  district attorney with evidence he had gathered against

13  Defendant.  The first recorded interview, on January 26, 1995,

14  was attended by Winn, Silbar, and Richards.  (RT, 8/15/95,

15  pp.105-108, 144-145).  The second, on February 2, 1995, was

16  attended by Winn, a Detective Schultz, and Richards.  (RT,

17  8/15/95, pp.144-145).  At the third interview, on February 16,

18  1995, Winn, Detective Glen Caldwell, Richards' attorney Deputy

19  Public Defender Linda Van Winkle, and Richards were present.

20  (RT, 8/15/95, pp.144-145).  Richards also acknowledged having

21  had as many as ten unmonitored telephone conversations with

22  Deputy District Attorney Silbar, after the January 26th

23  interview.  (RT, 8/15/95, p.116).  [Transcripts of the three

24  tape recorded interviews are attached and labeled as

25  Exhibit "B."

26          During testimony at the preliminary hearing, Richards

27  freely acknowledged lying to obtain information from Defendant.

28  (RT, 8/17/95, p.234).  He also admitted deliberately soliciting

4

1 highly incriminating handwritten notes from Defendant,

2 including telling the Defendant to write "some pretty scary

3 shit" in a note to a victim. (RT, 8/17/95, p.245). (RT,

4 8/17/95). Richards also offered Defendant help with his legal

5 affairs, despite his knowledge that Defendant was already

6 represented by counsel. (RT, 8/17/95, pp.231-232, 267-268).

7         On the last day of the preliminary examination,

8 Richards admitted he lied under oath about the January 10th

9 meeting with Garrison, in that in his previous testimony he had

10 denied talking with Garrison about informing on another inmate.

11 (RT, 8/21/95, p.111). He lied to the court, he stated, because

12 he feared the detective would get in trouble for doing

13 something improper. (RT, 8/21/95, pp.116-118). Richards had

14 testified that he did not recall Garrison showing him a

15 photograph of a suspect, and he denied that Garrison expressly

16 proposed that Richards elicit statements or develop evidence

17 against this individual, if Garrison could arrange to have

18 Richards and the suspect housed together in the same cell.

19 (RT, 8/21/95, pp.112-115). With Silbar's promise not to

20 prosecute him for perjury, Richards now confessed that he had

21 deliberately lied about this. (RT, 8/21/95, pp.111-114, 120).

22         From his prior experience as an informant, Richards

23 knew the likelihood existed that he would get consideration for

24 providing information against another inmate. (RT, 8/16/95,

25 p.161, 169). He also believed the particular information he

26 had gathered would be useful to the prosecutor and

27 investigators in Defendant's case. (RT, 8/15/95, p.101; RT,

28 8/17/95, p.261). Although Richards claimed during the

RUDOLPH E. LOEWENSTEIN
Law of
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

5

755

1  interviews that he was motivated to inform on Defendant by his

2  sense of civic duty, he admitted during preliminary hearing

3  testimony that his purpose was always to obtain leniency in his

4  own pending felony case. (RT, 8/17/95, p.262). Rather than go

5  to state prison as a *second striker*, he had been seeking a

6  commitment to the Delancey Street drug program since June of

7  1994. (RT, 8/16/95, p.167). The agreement under which

8  Richards finally realized his objective to enter Delancey

9  Street included Richards' promise to testify against Defendant.

10  (RT, 8/21/95, pp.113, 119).

11      Informant Richards was released from Orange County

12  Jail and sentenced to the Delancey Street program, as a result

13  of his cooperation in this case.

14

15                      **ISSUE**

16  **SHOULD THE TESTIMONY OF INFORMANT RICHARDS**
   **BE EXCLUDED IF RICHARDS, WHILE WORKING AS**

17  **AN AGENT OF LAW ENFORCEMENT, DELIBERATELY**
   **ELICITED INCRIMINATING EVIDENCE FROM**

18  **DEFENDANT BROOKS WHILE BROOKS WAS**
   **REPRESENTED BY COUNSEL?**

19

20

21                     **ARGUMENT**

22  **THE TESTIMONY OF INFORMANT RICKY RICHARDS**
   **MUST BE EXCLUDED AT THE DEFENDANT'S TRIAL,**

23  **BECAUSE THE INFORMANT WAS WORKING AS AN**
   **AGENT OF LAW ENFORCEMENT WHEN HE**

24  **DELIBERATELY ELICITED INCRIMINATING**
   **STATEMENTS FROM DEFENDANT BROOKS IN**

25  **VIOLATION OF DEFENDANT'S FIFTH AMENDMENT**
   **RIGHT TO REMAIN SILENT AND HIS SIXTH**

26  **AMENDMENT RIGHT TO COUNSEL.**

27      The Fifth Amendment protects against custodial

28  interrogation of an accused by a police agent, after the

accused has invoked his right to remain silent. <u>Miranda v.</u>

6

*Law Offices of*
**RUDOLPH E. LOEWENSTEIN**
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

756

1  <u>Arizona</u> (1966) 384 U.S. 436.  An "interrogation" is either

2  express questioning or other police actions that are reasonably

3  likely to elicit an incriminating response.  <u>Rhode Island v.</u>

4  <u>Innes</u> (1980) 446 U.S. 291, 301.  In the case at bar, Defendant

5  lawfully invoked his right to remain silent on January 5, 1995.

6  [See Invocation of Right to Counsel, Exhibit A attached].

7  After that date, while Defendant was in custody, Ricky Richards

8  used his experience as an informant and his unique position at

9  the jail to win Defendant's trust.  Richards then proceeded to

10  question Defendant and elicit incriminating evidence from him,

11  per the instructions of Detective Garrison.

12      The Sixth Amendment guarantees an accused the right

13  to counsel, once formal charges have been brought.  <u>Maine v.</u>

14  <u>Moulton</u> (1985) 474 U.S. 159, 176.  Under this guarantee, the

15  state has an "affirmative obligation not to act in a manner

16  that circumvents the protections accorded the accused by

17  invoking this right."  <u>Id</u>.  The Defendant in this case lawfully

18  invoked his right to counsel on January 5, 1995. [see Exhibit A

19  attached].

20      A defendant's incriminating statements deliberately

21  elicited by a law enforcement agent after the defendant is

22  represented by counsel are to be excluded in the trial of the

23  charged offense.  <u>Massiah v. United States</u> (1963) 377 U.S. 201.

24  To prevail on a claim of violation of the tenets of <u>Massiah</u>, a

25  defendant must demonstrate that both the government and the

26  informant took some action, beyond merely listening, that was

27  deliberately designed to elicit incriminating remarks from the

28  defendant. <u>In re Wilson</u> (1992) 3 Cal.4th 945, 950, citing

RUDOLPH E. LOEWENSTEIN
Law of
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

757

1  Kuhlmann v. Wilson (1986) 477 U.S. 436, 459.  Moreover,

2  evidence that an informant had a prior working relationship

3  with police gives rise to an inference that the informant acted

4  as a government agent when he obtained information from the

5  defendant. Kuhlmann at 436.

6          In United States v. Henry (1979) 447 U.S. 264, a

7  government agent instructed an informant on the same cellblock

8  as Henry to be alert to statements, but not to initiate any

9  conversations with or question Henry about the bank robbery for

10 which Henry had been indicted.  After the informant's release

11 from jail, he reported to the government that he had engaged in

12 conversation with Henry.  The informant furnished incriminating

13 statements for which he was paid.  Henry was convicted on the

14 basis of the informant's testimony at trial.  Determining that

15 the incriminating statements were "deliberately elicited"

16 within the meaning of Massiah, the United States Supreme Court

17 held: "**By intentionally creating a situation** likely to induce

18 **Henry to make incriminating statements without the assistance**

19 **of counsel, the government violated Henry's Sixth Amendment**

20 **right to counsel.**" Henry at 274 (emphasis added).  In Henry,

21 informant Nichols operated under closely similar conditions to

22 informant Richards in the case at bar.  The Henry court noted:

23          "First, Nichols was acting under
            instructions as a paid informant for the
24          government; second, Nichols was ostensibly
            no more than a fellow inmate of Henry; and
25          third, Henry was in custody and under
            indictment at the time he was engaged in
26          conversation by Nichols.

27          The Court of Appeals viewed the record as
            showing that Nichols had access to Henry
28          and would be able to engage him in
            conversations without arousing Henry's

RUDOLPH E. L. WENSTEIN
Law of
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

758

1    suspicion." Id. at 270."

2        In defendant Brooks' case, investigators

3   intentionally utilized a situation likely to induce defendant

4   Brooks to make incriminating statements without the assistance

5   of counsel, as was done in Henry.  As is indicated by informant

6   Richards' relationship with Detective Garrison, Richards was a

7   longtime police informant.  After furnishing incriminating

8   statements made to him by the defendant, Richards was rewarded

9   or paid off with a release from custody and a commitment to the

10  Delancey Street program, as a sentence on his own pending

11  felony.

12       It is well recognized that an inmate such as

13  Defendant Brooks is vulnerable to the entreaties of a

14  sophisticated informant such as Ricky Richards.  The court in

15  People v. Whitt, (1984) 36 Cal.3d 724, followed this reasoning

16  when it cited the facts of Henry, as follows:

17           "A factor which is significant in the
             analysis is the accused's custodial status.
18           As Henry notes, 'the mere fact of custody
             imposes pressures on the accused;
19           confinement may bring into play subtle
             influences that will make him particularly
20           susceptible to the ploys of undercover
             Government agents....[T]he incriminating
21           conversations between Henry and Nichols
             were facilitated by Nichols' conduct and
22           apparent status as a person sharing a
             common plight.' [citation]." People v.
23           Whitt (1984) 36 Cal.3d 724, 742. (emphasis
             added)
24
        Defendant Brooks was in custody facing serious
25
    charges.  Richards was a fellow inmate who cleverly portrayed
26
    himself as one "sharing a common plight."  That Richards knew
27
    he had some influence over Brooks is evident in Richards'
28
    statement, in the January 26th taped interview with

                                9

1   investigators, that he felt like a babysitter for the mostly
2   first-timers in his sector, and that defendant Brooks "fit
3   right in with the inmates." [Reporter's Transcript of the
4   Recorded Interviews, Exhibit B, 1/26/95, p.16].   In addition to
5   Richards' extraordinary freedom of access to the Defendant,
6   Richards' familiarity with the criminal justice system and the
7   inner workings of the jail gave him credibility among other
8   inmates that enabled him to win the Defendant's trust.

9        On very similar facts, the Henry Court found that the
10  incriminating statements were "deliberately elicited" from the
11  accused, in violation of his Sixth Amendment right to counsel,
12  even though law enforcement protested that the informant was
13  not instructed to elicit the information.   In fact, the
14  government claimed informant Nichols was only to passively
15  listen.

16       The critical issue for any Massiah/Henry analysis is
17  was there a prior working relationship between the informant
18  and law enforcement, and did the government knowingly exploit
19  the "opportunity to coax information from a formally charged
20  suspect " in the absence of counsel?

21       The California Supreme Court, in People v. Gonzalez,
22  (1990) 51 Cal. 3d 1179, set the standard for the determination
23  of governmental agency even though it denied such a claim by
24  defendant Gonzalez.   The Gonzalez analysis is helpful to this
25  court's review by virtue of the distinct factual differences
26  between the case at bar and the informant's position in
27  Gonzalez.   The Gonzalez jury convicted the defendant of the
28  first degree murder of a peace officer and of assault upon

RUDOLPH E. LoewENSTEIN
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

1  another peace officer by means likely to produce great bodily
2  injury.   These offenses were committed during the execution of
3  a search warrant at Gonzalez's residence.   His defense was that
4  he believed the officers, who were not in uniform, were members
5  of a rival gang attacking his residence.   A jailhouse informant
6  testified for the prosecution that Gonzalez had admitted to him
7  his desire to kill an officer and to use mistaken self-defense
8  as his defense.

9       The informant in Gonzalez had <u>no prior working</u>
10 <u>relationship</u> with authorities.   Furthermore, there was no
11 evidence of the informant being directly motivated by the
12 police.   The Gonzalez court determined the informant acted on
13 his own initiative in eliciting information from the defendant,
14 so there was no knowing exploitation.   However, in Defendant
15 Brooks' case, informant Richards called Detective Garrison,
16 then met with not only the detectives involved in this
17 investigation, but also the deputy district attorney
18 prosecuting Mr. Brooks.

19      The facts of Gonzalez are in marked distinction to
20 the circumstances of the instant case.   Here, Richards was a
21 longtime police informant, known to have cooperated with
22 Detective Garrison of the Anaheim P.D. in particular.   Garrison
23 instructed Richards to inform on a fellow inmate and put
24 Richards in touch with investigators in the Brooks matter.
25 Richards was a "house mouse" with freedom of movement and
26 access to other prisoners.   Since Richards was a longtime
27 inmate, he appeared to others to have knowledge of the system.
28 Plus, several unrecorded communications concerning the Brooks

11

76

1    case took place between Richards and Silbar.   In the end, after

2    providing copious notes and information incriminating Brooks in

3    the crimes charged against him, Richards got the lenient result

4    he sought in his own case -- commitment to Delancey Street.

5         In spite of Richards' protestations that he was not

6    acting under police direction, such declarations are not

7    dispositive in a determination of whether statements were

8    "deliberately elicited."   In People v. Whitt, supra, the

9    California Supreme Court affirmed Whitt's conviction where the

10   evidence showed that upon Whitt's arrest in San Bernardino on

11   murder and other charges, he was put in a jail cell with Jimmy

12   deLoach.   Although deLoach had formerly been an informer for

13   the D.E.A. in Cleveland and for the San Diego P.D., this fact

14   was unknown to authorities in San Bernardino.   Whitt confided

15   details of the crimes to deLoach, who then volunteered the

16   information to police investigators.   No special treatment or

17   remuneration was ever given to deLoach for the information,

18   which helped to convict Whitt.   However, the California Supreme

19   Court gave this court guidance in its determination of the

20   circumstances of this case where it held, at page 742, the

21   following:

22               "In sum, the critical inquiry is whether
                 the state has created a situation likely to
23               provide it with incriminating statements
                 from an accused.   If it has, it may not
24               disclaim responsibility for this
                 information by the simple device of telling
25               an informant to 'listen but don't ask.'
                 Thus, the trial court's findings that de
26               Loach was told not to question Whitt and
                 that he did not do so are irrelevant to the
27               question whether Whitt's statements were
                 deliberately elicited.
28
                 Richards did far more than merely listen and report

Law Offices of
RUDOLPH E. LOEWENSTEIN
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

1  to investigators on his own initiative.  Richards maintained

2  frequent contact with investigators, in the form of recorded

3  and unrecorded communications.  In his zeal to obtain and

4  document evidence for investigators, Richards went to

5  remarkable lengths to laboriously accumulate a stockpile of

6  notes recording the content of conversations with the

7  defendant.  He made frequent visits to Brooks' cell, portraying

8  himself as something of an authority on the criminal justice

9  system and legal matters, leading Brooks to seek his advice and

10 help at various times.  Richards also gave Brooks the

11 impression that he would be released soon and would be willing

12 to undertake criminal activity, in the form of intimidating

13 witnesses, in Brooks' behalf.  What's more, Richards carefully

14 obtained and preserved handwritten notes, both for the purpose

15 of handwriting analysis and for the incriminating nature of

16 their content.

17        The Court in Whitt, applying the Massiah/Henry line

18 of cases, found deLoach did not deliberately elicit statements

19 from Whitt.  Id. at 744.  However, in contrast to the case at

20 bar, deLoach had never received any promises of leniency, nor

21 did he get a more lenient sentence or any other favorable

22 treatment.  Furthermore, even though detectives offered to

23 speak to the prosecutor on deLoach's behalf after deLoach first

24 provided information, there was no prior relationship existent.

25 The Whitt court, at page 744, held:

26        "However, absent such a prior relationship
         with deLoach, the mere acceptance of his
27        information, even with the promise to talk
         to the prosecutor, is not sufficient to
28        hold the police accountable for deLoach's
         subsequent actions.  Furthermore, the

RUDOLPH E. LOEWENSTEIN
Law of
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

763

RUDOLPH E. LOEWENSTEIN
Law of
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

promise to speak to the prosecutor was in no way conditioned on deLoach providing any further information.  The police did not indicate that more information would help influence the prosecutor towards leniency. Finally, the police made no arrangements to contact deLoach again after July 8th regarding his conversations with Whitt. Detective Swanlund met with deLoach on July 25th only to notify him that Swanlund was going to release the July 8th report to the defense."

Contrary to the facts in <u>Whitt</u>, **investigators in the BROOKS case knew of the prior confidential relationship between Richards and law enforcement personnel**.  Detective Garrison made that prior relationship clear when he brought Richards to the attention of Detective Winn.  (RT, 8/16/95, p.112).  Aware that Richards had served in this capacity before, the investigators understood that Richards expected something in return for supplying information.

Similarly, knowing investigators were aware of his relationship with Detective Garrison, Richards had reason to anticipate that police would understand his expectation of favorable treatment in return for valuable information. Clearly, both sides knew the rules of the game.  Given his testimony, <u>supra</u> at p.4, Richards' claim in his interviews that he was doing his "civic duty" [RT, 1/26/95, p.22] rings hollow.

An indication that Richards and both the Newport Beach Police Department and the District Attorney's office expected Richards to continue gathering information from Brooks is Richards' response when asked in the first taped interview if the defendant told him about a particular alleged rape: "No he didn't.  He hasn't gotten in to that <u>yet</u>." [Exhibit B, 1/26/95, p.14]  **Richards' answer confirms both parties'**

14

76A

1 <u>expectations that further information will be gathered and that</u>

2 <u>the interrogation was being directed by law enforcement to meet</u>

3 <u>specific objectives</u>.  Not surprisingly, given his marching

4 orders, two additional taped interviews followed once Richards

5 had accomplished his mission.

6       Additionally, law enforcement expressly told

7 informant Richards that the disposition of his case depended on

8 the value of the information he had. [Exhibit B, 2/16/95, pp.2-

9 3] As a practical matter, however, this was clear to Richards

10 from the outset of his relationship with investigators, as

11 evidenced in his tape recorded declarations.  In the first

12 taped interview of January 26 [Exhibit B], he stated the

13 following: that he started taking notes as soon as he realized

14 Brooks was talking about pending charges [p.7]; that Brooks is

15 only "just now startin' to talk about the Newport case" [p.11];

16 that Brooks hasn't <u>yet</u> gotten to the rape in the Newport case,

17 but he has expressed worry over D.N.A. in connection with that

18 one [p.14]; that Richards carefully noted detailed entries of

19 times, dates, and street locations mentioned by Brooks [p.21];

20 and finally, that he was enthusiastic over the prospect of

21 testifying before a jury [p.22].  Each of these statements

22 affirms Richards' awareness of the government's ongoing demand

23 for "valuable" information from their informant.

24       Even more importantly, the uncontroverted testimony

25 adduced at the preliminary hearing revealed that Detective

26 Garrison expressly recruited Ricky Richards to inform on an

27 inmate at the Orange County Jail.  By implication, given

28 Richards' long history as a police informant and his prior

RUDOLPH E. LOEWENSTEIN
Law office
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

765

1 relationship with Garrison in particular, the expected

2 consideration for Richards' services was to be some form of

3 leniency in his own pending felony case.  In response to

4 Garrison's proposition, Richards began his comprehensive

5 campaign to elicit and compile evidence that would be valuable

6 to the prosecution in the case against Defendant Brooks.

7 Ultimately, after providing police and prosecutors with a

8 wealth of incriminating evidence against Defendant, Richards

9 was rewarded for his efforts with commitment to the Delancey

10 Street drug program.

11      The facts enumerated above satisfy all the elements

12 deemed necessary, under the <u>Massiah</u> line of cases, to establish

13 governmental agency.  <u>**At the prompting of law enforcement, an**</u>

14 <u>**experienced informant deliberately elicited incriminating**</u>

15 <u>**evidence from an incarcerated suspect who was represented by**</u>

16 <u>**counsel**</u>.  In effect, the government created and knowingly

17 exploited a situation likely to induce Defendant to make

18 incriminating statements by encouraging a practiced informant

19 to utilize his skill as an agent of law enforcement, in return

20 for leniency in his own pending felony case.

21      Even though no existing case presents precisely this

22 factual setting, <u>**the Massiah line of cases supports a finding**</u>

23 <u>**of governmental agency in circumstances, such as in the case at**</u>

24 <u>**bar, where all the elements are present but the object of the**</u>

25 <u>**government's and the agent's activities is replaced with a**</u>

26 <u>**substitute target**</u>.  The facts in this case clearly demonstrate

27 governmental agency, despite Richards having substituted one

28 target for another.  In other words, a "transferred intent" on

RUDOLPH E. LOEWENSTEIN
Law Office of
IRVINE PLAZA
17621 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

1  the part of the informant will not negate a finding of

2  governmental agency where all the requisite elements are

3  present.

### CONCLUSION

5      The legal test for governmental agency requires

6  action by both the government and the informant deliberately

7  designed to elicit incriminating remarks from the Defendant.

8  As disclosed through the preliminary hearing testimony of Ricky

9  Richards and Detective Garrison, the active recruitment of

10  Richards by Garrison constituted deliberate activity by

11  government.  Also, the devious, albeit skilled, methods

12  employed by Richards in obtaining the evidence were deliberate

13  activity on the informant's part.  That the informant

14  transferred his intent and substituted one incarcerated suspect

15  for another does not alter the calculus for a finding of

16  governmental agency.

17      Defendant Brooks has asserted a compelling factual

18  basis in support of a finding that informant Ricky Richards was

19  acting as a government agent when he deliberately elicited

20  incriminating statements from Defendant, who was represented by

21  counsel.  Therefore, all such evidence was obtained by Richards

22  in violation of Defendant Brooks' Fifth Amendment right to

23  remain silent and his Sixth Amendment right to counsel.  For

24  this reason, Defendant Brooks respectfully urges this court to

25  exclude from trial all testimony of Ricky Richards.

26  DATED:  April 11, 1996              Respectfully submitted,

27

28                                      RUDOLPH E. LOEWENSTEIN
                                        ATTORNEY FOR DEFENDANT
                                        STEVEN DEXTER BROOKS

Law Office of
RUDOLPH E. L. LOEWENSTEIN
IRVINE PLAZA
17821 IRVINE BOULEVARD, SUITE 114
TUSTIN, CALIFORNIA 92680
TELEPHONE (714) 544-9844

17

767

EXHIBIT

# 2

# ARGUMENT

## I.

## RICKY RICHARDS' TESTIMONY WAS PROPERLY ADMITTED, BECAUSE RICHARDS WAS NOT ACTING AS AN AGENT FOR LAW ENFORCEMENT WHEN HE COLLECTED INFORMATION FROM APPELLANT WHICH HE LATER DISCLOSED TO POLICE

Appellant contends the trial court improperly admitted the testimony of jailhouse informant Ricky Richards. Specifically, appellant claims Richards was a government agent who elicited information from appellant in violation of his Sixth Amendment right to counsel. (AOB 15-28.) Richards was not acting on behalf of any law enforcement agent at the time he collected incriminating information from appellant. Rather, Richards collected the information without the knowledge of police for the purpose of using it later for leniency in his own case. Accordingly, Richards' conduct did not implicate appellant's Sixth Amendment right to counsel and Richards' testimony was properly admitted.

## A.   The Hearing Concerning Ricky Richards

The relevant facts were elicited at a pretrial hearing brought by appellant to suppress Richards' testimony. Ricky Richards, a life-long criminal, had been a police informant to four or five different police agencies over a period of many years. Richards admitted committing 50 or 60 burglaries in exchange for a promise not to be prosecuted on those cases. (1 CT 304-306, 315.) Between June and December 1994, Richards attempted to get members of the Anaheim Police Department to help him obtain leniency in his pending felony

information. (3 CT 817-818.) Richards explained that he had contact with appellant because of his cleaning responsibilities at the jail. (3 CT 819-820.) Richards stated that appellant volunteered details without prodding. (1 CT 191; 3 CT 821-825.) Claudia Silbar asked Richards why he was telling them about appellant, and he responded that he felt it was his civic duty but he was not expecting anything in exchange. (1 CT 194-195; 3 CT 835.)

After this initial interview, Winn did not believe Richards would be getting more information from appellant. (1 CT 187, 192.) Detective Winn had never worked with a jailhouse informant before, but he suspected Richards was hoping for consideration for the information he had provided. (1 CT 201.)

Richards left several telephone messages for Detective Winn, but there was no discussion of Richards getting a deal, or continuing to obtain information from appellant. (1 CT 225-226.) Further, Winn did not suggest to Richards that he wanted more information. (1 CT 228.)

On February 1, 1995, Richards called Winn and said he had more information. Richards left Winn a message saying appellant had made some comments about the Newport rape. On February 2, 1995, Winn went back to the jail and interviewed Richards a second time. (1 CT 203 207; 3 CT 849-862.) At that interview, Richards talked about a letter appellant had written which said he wanted his brother to intimidate one of the victims. He also said one of the victims had a tattoo on her buttocks and he stole money from her purse which was in the living room. (1 CT 204.)

Between February 2, 1995, and February 16, 1995, Winn neither requested nor suggested to Richards that he obtain more incriminating information about appellant. (1 CT 230.) Richards'

informant whom the state has hired to obtain incriminating
statements, even if they are made voluntarily and without
solicitation." (*People* v. *Memro* (1995) 11 Cal.4th 786, 827-828,
citing *Massiah* v. *United States* (1964) 377 U.S. 201, 12 L.Ed.2d
246, 84 S.Ct. 1199, *United States* v. *Henry* (1980) 447 U.S. 264,
65 L.Ed.2d 115, 100 S.Ct. 2183, and *Maine* v. *Moulton* (1985)
474 U.S. 159, 88 L.Ed.2d 481, 106 S.Ct. 477.)

A trial court's ruling to allow a jailhouse informant to testify
presents a factual question, which is reversible only for abuse of
discretion. (*People* v. *Memro*, *supra*, 11 Cal.4th at p. 828.) Here, the
trial court ruled as follows:

"It appears that this is a case where police were making
use of the inmate's own motivation. Mr. Richards was highly
motivated, and the police made use of that motivation.

"I looked through the exhibits to determine whether or not
either the DA or the police had requested Richards to solicit
any information. The closest we got was Winn says, 'Okay.
Did he tell you anything about the rape?' Richards says, 'No,
he didn't. He hasn't gotten into that yet.' Winn's response to
that was 'Okay.' There was nothing further, no request to get
that information from us.

"There was another comment by Winn, 'Did he -- Did he
ever tell you what the girl looked like?' Richards, 'No, he
didn't, not yet. He hasn't talked that much about it.' Again,
Winn says 'Okay' and nothing further. Perhaps he had some
unspoken hope that he would get the information, but there
was no solicitation.

"For that reason, the court is going to deny the motion."
(2 CT 471-472.)

The court also stated,

"It was a lot closer when I read your brief than it was after
I read all the evidence submitted. I don't find to be the issue
[sic] close at all anymore. (1 RT 171.)

"If you read all of the testimony and draw all of the
inferences from the testimony, Winn literally didn't want
anything to do with Richards. Winn was specific in making the
record absolutely clear that he never hinted, suggested, implied
that Richards go forward and get any information for him.

Appellant did not establish the first prong of this two part test. Although Richards unquestionably used deceit to obtain incriminating information from appellant, there was no government involvement in the collection of information.

> "Where the informant is a jailhouse inmate, the first prong of the foregoing test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement or guidance." (*In re Neely, supra*, 6 Cal.4th at p. 915.)

In *People* v. *Memro, supra*, 11 Cal.4th 786, the court found no violation of the defendant's right to counsel on facts remarkably similar to those presented here. There, Cornejo, a notorious jailhouse snitch with a long history of testifying for the government, was awaiting trial for murder when he elicited an incriminating statement from the defendant. Cornejo testified at the defendant's trial about that statement, which was an admission by the defendant that his earlier confessions to police were made voluntarily. In those confessions, defendant had admitted that he had sexually molested and killed three children. Although Cornejo stated that he was testifying "out of a moral consciousness," the court recognized Cornejo was hoping for lenience from the parole board, and had been promised safe housing. However, at the time Cornejo obtained the defendant's statements, he had been promised nothing in exchange.

The Supreme Court found that the defendant's Sixth Amendment right to counsel was not violated by the admission of Cornejo's testimony.

> "In our view, no constitutional question arises unless the informant is an agent of the state at the time he or she elicited the statements that would be the subject of later testimony." (*People* v. *Memro, supra*, 11 Cal.4th at p. 828.)

25

In *Kuhlman* v. *Wilson* (1986) 477 U.S. 436, 91 L.Ed.2d 364, 106 S.Ct. 2616, the Supreme Court stated that:

> "[T]he primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since the Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached, a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." (*Id.*, at p. 459, citations omitted.)

That is the situation here. Richards collected information on his own and then reported it to the police, hoping to make a deal.

Appellant's reliance on *United States* v. *Henry*, *supra*, 447 U.S. 264, 65 L.Ed.2d 115, 100 S.Ct. 2183, is misplaced. In *Henry*, the informant was contacted by the government prior to having any contact with the defendant. In finding a Sixth Amendment violation, the Court found it significant that the informant was acting under instructions as a paid informant for the government at the time he obtained the information, and he was paid on a contingent basis if he could produce useful information. (*Id.*, at p. 270.) Here, no such relationship existed between Richards and the police or district attorney at the time appellant made incriminating statements to Richards.

Richards was not working for or with the knowledge of law enforcement agents when he solicited incriminating information from appellant. The fact that Richards later exchanged that information for leniency did not transform the collection of that evidence into a violation of appellant's right to counsel. Accordingly, Richard's testimony was properly admitted and appellant's convictions must stand.

EXHIBIT

#3

**ARGUMENT**

I.  **BECAUSE A GOVERNMENT INFORMANT ELICITED
    SELF-INCRIMINATING STATEMENTS FROM APPELLANT,
    AND THOSE STATEMENTS WERE AN IMPORTANT PART
    OF THE GOVERNMENT'S CASE AGAINST HIM, THE
    JUDGMENT SHOULD BE REVERSED**

A.  **INTRODUCTION**

Appellant filed two related pretrial motions for relief, both of which were based on the series of encounters in the jail in which government informant Ricky Richards elicited a great deal of incriminatory information from him.  One motion sought dismissal of the case (C.T. 770 et. seq.), and one motion sought suppression of the informant's testimony and its derivative fruits (C.T. 749 et. seq.).  The parties argued and submitted the motions on an extensive evidentiary record that had been compiled in the Municipal Court (C.T. 1-651, passim; R.T. 114-125, 147-175).  The court denied both motions.  (R.T. 171-175.)

Appellant contends that in doing so the court erred, and as a result the judgment must be reversed and either the case must be dismissed, or, at a minimum, much of the evidence from the first trial must be excluded.

///

///

15

gathered from appellant, including details on the Margaret R. and Thu Hai T. incidents which could only have come from the perpetrator.[6]  Richards also had as many as ten unmonitored telephone conversations with Deputy District Attorney Silbar. (C.T. 105-108, 116, 144-146.)

Richards had used his position as a tier tender at the jail to contact appellant and elicit incriminating statements and writings from him.  Richards' method was to stop by the cell door, engage in conversation with appellant, then return to his own cell and record notes of what appellant had said.  (C.T. 552.)

In his testimony, Richards admitted having lied to obtain information from appellant, and having deliberately solicited from appellant the highly incriminating handwritten notes (copies at C.T. 877-878) which were later introduced as trial exhibits 89, 90, and 91.  Richards admitted having told appellant to write some "pretty scary shit" in the threatening note to Margaret R. (C.T. 404, 415.)  Richards also acknowledged having offered to help appellant with his legal affairs.  (C.T. 401-402, 437-438.)

During this period, Richards also actively elicited information from appellant about his relations with his lawyer. (C.T. 383-384.)  In one note to appellant, Richards asked, "Did you talk to your attorney?" and "What did she say?"  (*Ibid.*)  In another note, Richards requested information from appellant

---

[6]  Transcripts of the interviews, conducted on January 26, February 2, and February 16, 1995, appear in the record at C.T. 817-847, 849-862, and 864-875.

## C. ELICITATION OF INFORMATION FROM A DEFENDANT BY A POLICE INFORMANT VIOLATES THE SIXTH AMENDMENT RIGHT TO COUNSEL

The law applicable to appellant's claim for relief on account of the interference of police informant Ricky Richards has been clearly spelled out in a series of cases by the United States and California Supreme Courts.

In Massiah v. United States (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], two defendants were indicted for possession of narcotics. One of them cooperated with the prosecution in their case against his co-defendant, by allowing the police to place a radio transmitter in the informant's car. Subsequently, the informant engaged the target in conversation while the police listened by radio. The United States Supreme Court found a violation of the target's Sixth Amendment right to counsel, and held the statements inadmissible against him at trial, because the government deliberately elicited incriminating statements from the defendant in the absence of his counsel. (377 U.S. at p. 206.)

In United States v. Henry (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct 2183], a jailmate of the defendant was a paid confidential informant for the F.B.I. An F.B.I. agent told the inmate to be alert to any statements made by prisoners, but not to initiate or engage in any questioning of Henry regarding his case. Learning that the informant and Henry had conversed about Henry's case, the agent paid the informant for the information, and the informant testified at Henry's trial. Reversing the

19

incriminating information from the accused in the absence of counsel. (*Id.*, at p. 476, fn. 12.)

Most recently, in <u>Kuhlmann</u> v. <u>Wilson</u> (1986) 477 U.S. 436 [91 L.ED.2d 364, 106 S.Ct. 2616], the court rejected a Sixth Amendment challenge. There, the defendant was placed in a jail cell with an informant. Without any questioning or prompting by the informant, the defendant related details about why he was arrested. The court stated: " '[T]he Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached,' [citations][.] [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (477 U.S. at p. 459.) Because the defendant's statements were spontaneous and unsolicited, the court held, the Sixth Amendment did not forbid their admission in evidence even though the jailhouse informant had apparently been deliberately placed near the defendant so that he would be in a position to hear any incriminating statements. (*Id.*, at p. 460.)

The California Supreme Court has made the parallel observation that "a general police policy of encouraging inmates to provide useful information does not transform inmates into police agents." (<u>In re Williams</u> (1994) 7 Cal.4th 572, 598.)

21

the defendant's right to the assistance of counsel, as defined by
*Massiah*, is violated.  (*Id.*, at pp. 915-916.)

## D.  ANALYSIS:  THE ACTIONS OF THE POLICE, THE PROSECUTOR, AND THEIR INFORMANT VIOLATED APPELLANT'S RIGHT TO COUNSEL

Plainly, under the analysis dictated by the Supreme Court
cases discussed in part C., the elicitation of information from
appellant by Ricky Richards violated appellant's Sixth Amendment
right to counsel.

Indeed, the situation in *United States* v. *Henry* was
functionally almost identical to the situation here.  Appellant
was in custody facing very serious charges, and Richards was a
fellow inmate who appeared to share a common plight, and who
deliberately sought to assure appellant that he could be
"helpful," while it was Richards' real goal to act in his
established role as a government informant to elicit
incriminating information from appellant.  The importance of the
fact that Richards had a history as an informant, and was set
into action by one of his government "managers," could not be
overstated.  Obviously, the government here "created a situation
likely to provide it with incriminating statements from [the]
accused."  (*People* v. *Whitt*, *supra*, 36 Cal.3d at p. 742.)

23

jail to obtain more information from appellant, and accepted that information also.

Beyond any doubt, this formalized, mutual relationship between the government and Richards violated appellant's right to counsel, under all the relevant cases.  The trial judge's decision to the contrary cannot be sustained.

## E.  THE ERROR WAS PREJUDICIAL AND, UNDER THE CIRCUMSTANCES, SHOULD RESULT IN DISMISSAL OF THE PROCEEDINGS

As a result of the government's infiltration of and interference with the constitutionally guaranteed relationship between appellant and his counsel, the judgment in this case surely must be reversed.  The only question that would remain is whether the correct remedy is dismissal of the case, or instructions that the case may be retried, but without the testimony of Ricky Richards or the fruits of the improper government conduct.

"Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation . . . .  [W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information

Furthermore, in this connection, as the Boulas court noted, it is to be recalled that "[t]he remedy of exclusion of evidence is inadequate in instances of intentional subversion of the attorney-client relationship by governmental agents. 'An exclusionary remedy is not only ineffective as a deterrent, but the problems of proof inherent in the remedy when applied to violations of the right to counsel would be inadequate to assure that the prosecution does not benefit from the illegality.' " (188 Cal.App.3d at p. 434.)

This statement captures the reason why the instant case should be ordered dismissed, and not just reversed with an order for a new trial.

Further, this statement by the Boulas court spotlights the fact that, should the court choose the lesser remedy of reversal with an order to suppress the wrongfully gotten evidence in the second trial, it must be made clear in the remand order that the suppression must include not only Ricky Richards' testimony, but also the fruits of the wrongful conduct, i.e., all other evidence derived from the illicit police informant operation, lest the prosecution end up "benefit[ting] from the illegality."  In this instance, that would constitute most of the evidence in the case.

///

///

EXHIBIT

# 4

COURT OF APPEAL-4TH DIST., DIV. 3
**FILED**

MAR 2 3 1998



Stephen M. Kelly, Clerk

*NOT TO BE PUBLISHED*

Deputy Clerk

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | G020191 |
| Plaintiff and Respondent, | (Super. Ct. No. 95HF0026) |
| v. | O P I N I O N |
| STEVEN D. BROOKS, | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John J. Ryan, Judge.  Affirmed as modified.

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Janelle Boustany and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

struggled, and he put a blanket over her head, but she was still able to see. After penetrating her with a foreign object, he used a cable to tie her arms and legs together.

After Brooks left, Thu Hai untied herself and called the police who took her to the hospital for examination. The doctor's findings were consistent with her story. Thu Hai had seen Brooks once before at the residential care facility in 1992, when he had come to clean a wheelchair.

About two weeks later, Joyelle A. was in the apartment she shared with two roommates, Kelly and Megan. In the middle of the night, the roommates went out for some fast food and forgot to lock the door. Joyelle heard the door open and saw Brooks enter the well-lit room, holding a gun. After taking money from Kelly's dresser, Brooks forced Joyelle to lie down. He gagged her and tied her wrists and her ankles, using pieces of clothing. The two roommates returned, knocking on the door and ringing the bell. Brooks opened the door, pointed the gun at Kelly's head, then shoved her aside and ran away.

Almost three weeks later, a police officer stopped Brooks in his car. There were two loaded weapons inside, both in plain view. One of the weapons was a semiautomatic pistol. The officer arrested Brooks. The police found Margaret's telephone in Brooks's possessions, along with handgun ammunition, condoms and women's jewelry.

Joyelle, Kelly, Margaret, and Thu Hai each identified Brooks in a photographic lineup, a live lineup prior to trial, and at trial.

Ricky Richards was an inmate in the Orange County jail when Brooks arrived. Richards elicited incriminating statements and writings from Brooks, who candidly admitted guilt and gave detailed accounts of the crimes. He described how he entered the women's apartments, used a gun to coerce them, tied them up with clothing, and stole money and a telephone. He mentioned a time two roommates

3

*Massiah*, the Court found this constitutional protection had been denied "when there was used against [the defendant] at his trial evidence of his own incriminating words, which [government] agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Id.* at p. 206.)

The difference here is Richards was acting of his own volition. He spontaneously contacted the police regarding Brooks.[1]  Richards was not a state agent because he had 'commissioned' himself.  Having a "history of testifying for the government . . . does not automatically make an informant a state agent. [Citations.]" (*People* v. *Memro, supra,* 11 Cal.4th at p. 828.)  Richards testified he was gathering facts initially as his civic duty, but later hoped for leniency in exchange for the information.  This hope, however, did not transform Richards's actions into governmental action.  Richards would have been a "state agent" only if some agreement existed *before* his surreptitious investigation.  The trial court did not abuse its discretion in ruling Richards's testimony was admissible.

II

Brooks claims the court incorrectly denied his motion to exclude pretrial witness identifications which were unduly suggestive and violated his right to due process.  In addition, he claims the in-court witness identifications should have also been excluded as being tainted by the prior identifications.  The trial court properly allowed the identifications.

The due process clause requires the exclusion of evidence of a pretrial identification at trial if, based on the totality of the circumstances, the procedure was unnecessarily suggestive and conducive to mistaken identification. (*Neil* v. *Biggers* (1972) 409 U.S. 188, 198.) "It is the likelihood of misidentification which violates a

---

[1]      In denying the motion to exclude Richards's testimony, the trial court found the police "didn't create the situation. They certainly didn't ask for interrogation. And the record clearly supports the finding that Mr. Richards was working on his own with no encouragement, express or implied, from any law enforcement officer . . . . "

defendant's right to due process . . . ." (*Ibid.*) The "totality of the circumstances" encompasses the following factors: "[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. [Citation.]" (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 114; see also *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1222.) The burden is on Brooks to establish the identification procedures were unduly suggestive. (*Id.* at 1221.)

At a photographic lineup, Thu Hai initially identified a person other than Brooks as the perpetrator. Five days later a detective told her she had picked the wrong person. She said she was not completely sure she had chosen the right one. At a live lineup at the jail, Thu Hai was told the guilty party might not be present. She identified Brooks, saying she was 90 percent certain he was the person who raped her, compared to a 70 percent certainty of the correctness of the prior photographic identification. Later, Thu Hai had doubts about the live identification, not because of physical appearance, but because Brooks's voice had sounded softer than during the crime. In another photographic lineup some time later, Thu Hai picked out Brooks and said she remembered him from when he had come to the residential care facility to clean a wheelchair. No one had told her Brooks previously had worked for the home. Brooks failed to prove that based on the totality of the circumstances, Thu Hai's identification was highly unreliable.

Margaret identified no one from a lineup which did not contain a photo of Brooks. She selected his picture from the next set of photos and experienced nausea at seeing his photograph. She failed to select him from a photographic lineup that incorporated a close-up Polaroid picture of him that made his face appear very large. At a live lineup, Margaret identified Brooks, and stated he was trying to alter his voice. She was 90 percent positive her identification was correct.

The judgment of conviction is ordered modified by reducing the enhancement terms from ten to five years.[3]  As modified, the judgment is affirmed.


                                        WALLIN, J.

WE CONCUR:


SILLS, P. J.


CROSBY, J.

---

[3] By our calculations, this reduces the sentence from 137 years to life to 122 years to life.

8